# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Jacey Looper, | Case No.: 2:23-cv-01436-JAD-EJY |
| Plaintiff | |
| v. | **Order Granting Defendants' Motion for Summary Judgment on Federal Claims, Declining to Maintain Supplemental Jurisdiction over State-law Claims, and Closing Case** |
| Las Vegas Metropolitan Police Department, et al., | |
| Defendants | [ECF No. 23] |

A Las Vegas Metropolitan Police Department (Metro) K-9-unit dog attacked Jacey Looper while tracking the scent of a different person suspected of a crime. Looper sues human officers Glenn Obsenares and Brayden McMahill for civil-rights violations, negligence, and battery. She also seeks to hold Metro liable under *Monell v. Department of Social Services* for failing to adequately train its K-9 handlers.

The defendants move for summary judgment on all claims except negligence. Because it was not clearly established that the officers acted unlawfully, I find that the doctrine of qualified immunity shields Obsenares and McMahill from Looper's federal civil-rights claims, and Looper offers no evidence that Metro's policies were unconstitutional or the moving force behind her injuries. So I grant summary judgment on those claims. The disposition of the federal causes of action leaves no claims over which this court has original jurisdiction, so I decline to continue to exercise supplemental jurisdiction over Looper's negligence and battery claims and dismiss them without prejudice to her ability to refile these claims in state court.

# Background

Officer Brayden McMahill lost sight of a robbery-and-assault suspect after a foot pursuit on the afternoon of June 13, 2022.[1]  He called for backup, requested air support and a K-9 unit, and set up a perimeter around the block with other officers.[2]  Officer Glenn Obsenares responded to the call for backup and arrived on the scene with his K-9 partner Raider 30 minutes later.[3]  Raider is trained to bite and hold any suspect he is tracking, so when he finds a suspect, he bites that person until the officers physically remove him or his handler commands him to let go.[4]

## A.    While in pursuit of a fleeing suspect, Obsenares and Raider enter the pool area of a multi-building apartment complex.

Once arriving at McMahill's scene, Raider quickly started to "work the odor" and search for the suspect.[5]  Raider eventually made a "change in behavior" near a brick wall with a blue mural next to a multi-unit apartment-building complex.[6]  Obsenares updated McMahill, who was waiting outside his patrol vehicle nearby, that Raider had "caught odor."[7]  Obsenares and Raider

---

[1] ECF No. 23-2 at 9 (18:7–25) (deposition of Brayden McMahill).  The defendants filed compressed versions of the deposition transcripts for Officer McMahill, so four deposition pages are contained in one ECF page.  When citing to those transcripts, I first cite the ECF pagination and then cite the deposition pages and lines in parentheses.

[2] *Id.* at 9 (20:14–18); McMahill bodycam footage, T00:04:44Z–T00:05:12Z.

[3] *Compare* McMahill bodycam footage, T00:04:44Z–T00:05:12Z *with* Obsenares bodycam footage, T00:36:58Z.

[4] ECF No. 23-4 at 11 (28:6–14) (deposition of Glenn Obsenares).

[5] *Id.* at 15–16 (45:25–46:9).

[6] *See* Obsenares bodycam footage, T00:45:43Z.

[7] Obsenares bodycam footage, T00:45:43Z (Obsenares telling McMahill that Raider was "getting some odor over there near that blue mural on that wall").

then got back into the patrol vehicle and drove around the corner to investigate on the other side of the wall.[8]  McMahill went to provide coverage.[9]

Raider, McMahill, Obsenares, and one other officer arrived at a front gate of the multi-building apartment complex on the other side of the blue mural.[10]  They rang the gate doorbell,[11] but no one answered.[12]  So McMahill jumped over the fence to open the gate from the inside and let the others in.[13]

Inside the gate, Obsenares and Raider began searching the apartment-complex area.[14] They first cleared an outdoor common area with a hot tub and seating area.[15]  They then passed several apartment units facing various exterior hallways before going through a metal gate that had a sign that said, "Pool area closed."[16]  Beyond the metal gate was an enclosed, fenced-in area with a pool house and a seating area.[17]

**B.    Raider attacks pool-house occupant Jacey Looper instead of his intended suspect-target.**

Jacey Looper was renting the pool house for the week.[18]  She was inside it when the officers arrived to search the complex.  From her indoor vantage point, she could see the

---

[8] Obsenares bodycam footage, T00:45:45Z–T00:46:52Z.

[9] ECF No. 23-2 at 20 (63:9–16).

[10] Obsenares bodycam footage, T00:45:48Z.

[11] *Id.*

[12] *Id.* at T00:45:58Z–T00:49:38Z.

[13] *Id.* at T00:49:38Z–T:00:49:59Z.

[14] *Id.* at T00:50:11Z.

[15] *Id.* at T00:50:42Z.

[16] *Id.* at T00:50:51Z.

[17] *Id.*

[18] ECF No. 29-10.

1  officers—both human and canine[19]—along with police helicopters overhead.  She phoned her
2  mom to say that something was going on.[20]

3       Obsenares and Raider searched the east-side exterior of the pool house.[21]  Obsenares then
4  observed Raider perk his ears up higher—a sign that Raider was still searching—so they moved
5  on to the west side of the pool house.[22]  While they were there, Looper opened the door and
6  asked McMahill what was going on.[23]

7       Meanwhile, Obsenares and Raider moved back around the pool house from the west
8  side.[24]  Obsenares could hear McMahill talking with someone, but he could not make out who he
9  was talking to or what was being said.[25]  In this conversation, McMahill was telling Looper that
10 they were looking for a suspect and to go back inside.[26]  But before Looper closed the door,
11 Raider lunged through it and attacked Looper.[27]

12      Obsenares yelled verbal commands at Raider,[28] and it took about six seconds before he
13 was able to pull Raider off Looper.[29]  Obsenares immediately requested medical assistance for

14

15

16  [19] ECF No. 23-5 at 21:19–21, 25:2–26:17.

17  [20] *Id.*

    [21] Obsenares bodycam footage, T00:51:09Z.

18  [22] *Id.* at T00:51:25Z; ECF No. 23-4 at 17 (52:4–17).

19  [23] Obsenares bodycam footage, T00:51:34Z; ECF No.23-2 at 14 (38:6–15); ECF No. 23-5 at
    26:11–17.

20  [24] Obsenares bodycam footage, T00:51:12Z.

21  [25] ECF No. 23-4 at 18 (57:15–24).

    [26] ECF No. 23-5 at 27:3–29:2.

22  [27] *Id.* at 28:24–29:2; Obsenares bodycam footage, T00:51:43Z.

23  [28] Obsenares bodycam footage, T00:51:44Z; ECF No. 23-4 at 12 (32:14-17).

    [29] Obsenares bodycam footage, T00:51:44Z; ECF No.23-4 at 12 (32:11–17).

Looper, and McMahill and another officer rendered first aid for her bite wounds until medical

personnel arrived.[30]  Looper was transported via ambulance to the hospital.[31]

**C.    Looper sues Obsenares, McMahill, and Metro, and they move for partial summary judgment.**

Looper brings state and federal constitutional claims against Obsenares and McMahill for

unreasonable search and seizure and excessive force, she sues Metro and both officers for battery

and negligence, and she seeks to hold Metro liable for the officers' constitutional violations

under a *Monell* inadequate-training theory.[32]  The defendants move for partial summary

judgment, arguing that they are entitled to judgment as a matter of law on all of Looper's claims

except negligence.[33]  The officers first contend that Looper's claim for unreasonable search and

seizure fails as a matter of law because "[n]o search or seizure occurred," so they could not have

violated the Fourth Amendment.[34]  They further argue that Looper's excessive-force and battery

claims fail because Raider's bite was not an intentional use of force.[35]  And they assert that,

regardless, they are entitled to qualified immunity on Looper's federal civil-rights claims.[36]

Metro seeks summary judgment on the *Monell*-liability claim on the basis that Looper has

provided "no evidence [that Metro's] policies were unconstitutional or . . . in any way

---

[30] Obsenares bodycam footage, T00:52:04Z; McMahill bodycam footage at T00:56:25Z–T01:00:02Z.

[31] McMahill bodycam footage, T01:02:59Z–T01:13:03Z.

[32] ECF No. 7.

[33] ECF No. 23.

[34] *Id.* at 12.

[35] *Id.* at 13.

[36] *Id.* at 14.

contributed to her injury."[37]  The defendants don't seek judgment in their favor on Looper's

negligence claim because they acknowledge that Obsenares was negligent in his handling of

Raider.[38]

## Discussion

### I.    The doctrine of qualified immunity shields Officers Obsenares and McMahill from Looper's federal constitutional claims.

Qualified immunity shields government officials "from money damages unless a plaintiff

pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that

the right was 'clearly established' at the time of the challenged conduct."[39]  "A government

official's conduct violates clearly established law when, at the time of the challenged conduct,

[t]he contours of [a] right [are] sufficiently clear that every reasonable official would have

understood that what he is doing violates that right."[40]  The burden of showing that the right at

issue was clearly established at the time of the incident falls on the plaintiff.[41]  She need not

identify a case "directly on point, but existing precedent must have placed the statutory or

constitutional question beyond debate."[42]  "If the law did not put the officer on notice that his

conduct would be clearly unlawful, summary judgment based on qualified immunity is

appropriate."[43]

---

[37] *Id.* at 17–18.

[38] *Id.* at 6; *see also* ECF No. 23-6 at 29 (98:12–101:22).

[39] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

[40] *Id.* at 741 (cleaned up).

[41] *Robinson v. York*, 566 F.3d 817, 826 (9th Cir. 2009).

[42] *Id.*

[43] *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see also Pearson v. Callahan*, 555 U.S. 223, 245
(2009) (relaxing the *Saucier* framework for analyzing qualified immunity and holding that

1    The central dispositive inquiry for finding a right "clearly established" is "whether it

2    would be clear to a reasonable officer that his conduct was unlawful in the situation he

3    confronted."[44]  "To be clearly established, a right must be sufficiently clear that *every* reasonable

4    official would have understood that *what he is doing* violates that right."[45]  A defendant is

5    entitled to qualified immunity when no "precedent[] 'squarely governs' the facts here," meaning

6    that the court "cannot say that only someone 'plainly incompetent' or who 'knowingly violate[s]

7    the law' would have . . . acted as [the officials] did."[46]  As the Ninth Circuit put it just a few

8    months ago in *DeFrancesco v. Robbins*, "the 'contours' of the right must be 'sufficiently definite

9    that any reasonable official in the defendant's shoes would have understood that he was violating

10   it.'"[47]

11

12        **A.    The officers enjoy qualified immunity from Looper's unreasonable-search
              claim because it was not clearly established that the protective-search
13            exception does not apply to their warrantless search of the pool-house
              curtilage.**

14        In her first cause of action, Looper asserts a Fourth Amendment unconstitutional-search

15   claim against the officers.[48]  She theorizes that they performed an unlawful search when they

16   approached the pool house with Raider without consent, a warrant, or an exception to the warrant

17

18

---

19   summary judgment should have been granted to officers because the unlawfulness of their
     conduct was not clearly established).

20   [44] *Saucier*, 533 U.S. at 202.

21   [45] *Hamby v. Hammond*, 821 F.3d 1085, 1090 (9th Cir. 2016) (quoting *Taylor v. Barkes*, 575 U.S.
     822, 825 (2015)) (emphasis in *Hammond*).

22   [46] *Hammond*, 821 F.3d at 1091.

23   [47] *DeFrancesco v. Robbins*, 136 F.4th 933, 939 (9th Cir. May 7, 2025) (quoting *Kisela v.
     Hughes*, 584 U.S. 100, 105 (2018)).

     [48] ECF No. 7 at 7–8.

requirement.[49]   The defendants move for summary judgment on this claim, arguing without

elaboration that there was no search.[50]   Looper rebuts the defendants' assertion that no search

occurred, contending that "there is no question that [she] enjoyed a reasonable expectation of

privacy within the unit she was renting," and that expectation of privacy "extended to the fenced-

in private area surrounding [the] guest house [that she] rented."[51]   In their reply brief, the officers

argue that this search meets a handful of exceptions to the warrant requirement, including the

protective-sweep exception and, at a minimum, they are entitled to qualified immunity from

Looper's unconstitutional-search claim.[52]

### 1.    The government's use of a trained police dog to investigate the immediate surroundings of a home is a Fourth Amendment search.

The Supreme Court has made clear that "when it comes to the Fourth Amendment, the

home is first among equals."[53]   The "home and its traditional curtilage is given the highest

protection against warrantless searches and seizures."[54]   And the area "immediately surrounding

and associated with the home" is considered "part of the home itself for Fourth Amendment

purposes."[55]   That's because it is "intimately linked to the home, both physically and

psychologically," and where "privacy expectations are the most heightened."[56]   The parties refer

to the pool house as "residence" or "dwelling" and to the fenced-in area circling the pool house

---

[49] ECF No. 29 at 17.

[50] ECF No. 23 at 12.

[51] ECF No. 29 at 17 (cleaned up).

[52] ECF No. 32 at 11–14.

[53] *Florida v. Jardines*, 569 U.S. 1, 6 (2013).

[54] *United States v. Warner*, 843 F.2d 402, 405 (9th Cir. 1988).

[55] *Oliver v. United States*, 466 U.S. 170, 180 (1984).

[56] *California v. Ciraolo*, 476 U.S. 207, 213 (1986).

as "backyard" or "curtilage."[57]  Neither party argues that the pool house is not a "house" or that the area surrounding the pool house is not "curtilage."  So the officers needed a warrant or an exception to the warrant requirement if their activity in the curtilage of the pool house constituted a search for Fourth Amendment purposes.[58]

"Introducing a trained police dog to explore the area around the home in hopes of finding incriminating evidence" constitutes a search within the meaning of the Fourth Amendment.[59]  In *Florida v. Jardines*, the United States Supreme Court considered the limited question of whether a police officer who brought a drug-sniffing police dog on a six-foot leash to the front porch of a home had engaged in a Fourth Amendment search.[60]  The answer was yes.[61]  The High Court reasoned that an officer may "approach a home and knock" at the door because that is "no more than any private citizen might do."[62]  But there is no customary invitation to "introduc[e] a trained police dog to explore the area around the home in hopes of discovering incriminating

---

[57] *See* ECF No. 29 at 17 (Looper arguing that "there is no doubt that [there was a] reasonable expectation of privacy extended to the fenced[-]in private area surrounding the guest house Looper rented" and "this fenced in area is sy[]nonymous with a "backyard""); ECF No. 32 at 13 (defendants arguing that "[t]he pool house was a separate residence," "the pool house is a separate living structure," and "the fact Raider hit on plaintiff's backyard justified the officers searching the curtilage," and citing Supreme Court precedent holding that "the Fourth Amendment is not implicated when police officers approach that door in the reasonable belief that it is a principal means of accessing the dwelling").

[58] *See Jardines*, 569 U.S. at 6 ("Since the officers' investigation took place in a constitutionally protected area, we turn to the question of whether it was accomplished through an unlicensed physical intrusion.").

[59] *Id.* at 9.

[60] *Id.* at 7–8.

[61] *Id.* at 11–12.

[62] *Id.* at 8 (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)).

evidence" because "the background social norms that invite a visitor to the front door do not invite him there to conduct a search."[63]

*Jardines* is dispositive here. Obsenares and McMahill brought a police dog that was trained to find a suspect by tracking his scent to the curtilage of a dwelling, thus exceeding the police's customary license to enter the curtilage. The use of Raider to investigate the pool house and its immediate surroundings was also an example of the government using "'a device that is not in general public use' to 'explore details of the home that would previously have been unknowable without physical intrusion.'"[64] I therefore find that, under *Jardines*, the officers conducted a search within the meaning of the Fourth Amendment when they entered the pool house's curtilage with Raider.

This search was performed without consent or a warrant, so unless the officers can claim an exception to the warrant requirement, it was unconstitutional as a matter of law. Looper makes the conclusory argument in her response to the defendants' motion for summary judgment that "[t]here were no exceptions to the warrant requirement" that would justify the officers' warrantless search.[65] The defendants offer two in their reply: exigency and protective-sweep.[66] And they add that even if a constitutional violation occurred, they are shielded from liability under the doctrine of qualified immunity because Looper has "offered no clearly established law

---

[63] *Id.* at 9.

[64] *Id.* at 11.

[65] ECF No. 29 at 19.

[66] ECF No. 32 at 15.

1   suggesting the officers' objectives in this case were not protected under" either of these

2   exceptions.[67]

### 2.  It was not clearly established that the protective-sweep exception to the warrant requirement did not apply in this case.

5       The protective-sweep exception, first articulated by the Supreme Court in *Maryland v.*

6   *Buie*, allows law enforcement to conduct a "quick and limited search of premises, incident to an

7   arrest [ ] to protect the safety of police officers and others."[68]  Such a sweep is permitted if the

8   officer "possesses a reasonable belief based on specific and articulable facts that the area to be

9   swept harbors an individual posing a danger to those on the arrest scene."[69]  To determine

10  whether officers had a reasonable suspicion to conduct a protective sweep, courts must consider

11  the totality of the circumstances.[70]  Courts "must look at all the facts known to the officers and

12  consider all the reasonable inferences that could be drawn by them concerning the need to

13  conduct a protective sweep to protect them from violence."[71]

### a.  The officers had reasonable suspicion that a dangerous suspect was in the searched area.

16      The defendants argue that the protective-search exception to the warrant requirement

17  applies because "the officers knew that Raider had hit on the backyard and that the suspect was

---

[67] *Id.* at 14.  Because I find that the officers enjoy qualified immunity from the search claim based on the lack of clearly established law showing that the protective-sweep exception did not apply, I need not and do not reach the exigency exception.

[68] *Maryland v. Buie*, 494 U.S. 325, 327 (1990).

[69] *Id.* at 334.

[70] *United States v. Castillo*, 866 F.2d 1071, 1080 (9th Cir. 1988).

[71] *Id.*

dangerous."[72]  The Ninth Circuit has found the protective-sweep exception to apply in similar circumstances.  For example, in *United States v. Paopao*, officers received a tip that two men suspected of committing armed robberies were in an illegal gambling establishment.[73]  The Ninth Circuit held that because the tip was sufficient for the officers to believe that "the two robbers . . . were present," they were "justified in believing that at least one of the robbers could still have been in the apartment" and were therefore justified in conducting a protective sweep.[74] The court also found that one of the officers searching behind a sofa as part of the protective sweep "did not exceed [its] scope" because it was reasonable for the officers to suspect that someone could be hiding behind the sofa after a preliminary sweep of other parts of the apartment.[75]

Here, the officers were pursuing a suspect whom they knew was in the area but whose exact location was unknown.  So like in *Paopao*, it was reasonable to believe that the suspect could be hiding in the searched areas.  The suspect was also believed to be violent and dangerous because he was alleged to have beaten up and robbed a pregnant woman.[76]  So, because the officers were actively looking for a person reported to have committed a violent crime, and his

---

[72] ECF No. 32 at 14.

[73] *United States v. Paopao*, 469 F.3d 760, 762–63 (9th Cir. 2006).

[74] *Id.* at 767.

[75] *Id.  But see United States v. Furrow*, 229 F.3d 805, 812 (9th Cir. 2000), *overruled on other grounds by United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001) (finding that the protective-sweep exception did not apply to a search of a teenage-party site after all the suspects had been "rounded up" and the officers had no concern for their safety or the safety of others); *United States v. Franco*, 744 F. App'x 360, 363 (9th Cir. 2018) (unpublished) (finding that search of a bedroom after all suspects had been detained in the front of the home was not a protective sweep).

[76] *See* ECF No. 23-2 at 7 (12:10–24).

1  precise whereabouts were unknown, it was not clearly established that the officers' actions here

2  didn't fall under the protective-sweep exception to the warrant requirement.

3

                              **b.**       **It was not clearly established that the protective-sweep exception**

4                                         **only applied to a search incident to arrest.**

5       There is one wrinkle that complicates the qualified-immunity analysis here.  When the

6  Supreme Court established the protective-sweep exception in *Maryland v. Buie*, it described such

7  sweep as "a quick and limited search of premises, *incident to an arrest* and conducted to protect

8  the safety of police officers or others."[77]  But the search outside of Looper's rented pool house

9  was not incident to an arrest—the record doesn't even reveal whether these officers ultimately

10 found their suspect.  If the protective-sweep exception applied only to searches incident to arrest,

11 then it might have been clearly established that the exception did not save this search.  But there

12 is a split among circuits, and also within the Ninth Circuit, over whether police may conduct a

13 warrantless, cursory sweep even in situations when no arrest is made.

14      In the arrest-may-be-required camp is *United States v. Reid*.[78]  The Ninth Circuit

15 observed in *Reid* that no suspect was under arrest in concluding that the officers were not entitled

16 to conduct a protective sweep.[79]  But in reaching that conclusion, the panel also noted that the

17 "government did not point to any facts that demonstrated that a reasonably prudent officer would

18 have believed that the apartment 'harbor[ed] an individual posing a danger to those on the arrest

19 scene.'"[80]

20

21

---

[77] *Buie*, 494 U.S. at 327 (emphasis added).

[78] *United States v. Reid*, 226 F.3d 1020, 1027 (9th Cir. 2000).

[79] *Id.*

[80] *Id.*

In *United States v. Garcia*, however, the Ninth Circuit held that officers conducted a valid protective sweep of an apartment although the search was not performed incident to the arrest.[81]   Undercover officers posing as potential renters saw Garcia holding a package that they suspected contained cocaine.[82]   When Garcia allowed the officers to enter his apartment, they conducted a protective sweep to determine whether other people were there.[83]   The officers restrained Garcia during the sweep but did not arrest him until later—once they had discovered a cache of guns and drugs.[84]   Other circuits have also found that it is not necessary that a protective sweep be incident to an arrest, reasoning that the "incident to arrest" language in *Buie* merely described the facts of that particular case and does not limit the protective-sweep exception to cases involving a search incident to arrest.[85]

With *Reid* and *Garcia*, the Ninth Circuit's position on whether the protective-sweep doctrine applies to searches not incident to arrest is murky, and was so at the time of this search.[86]   There was thus no clearly established law putting the officers on notice that they could

---

[81] *United States v. Garcia*, 997 F.2d 1273 (9th Cir. 1993).

[82] *Id.* at 1277.

[83] *Id.*

[84] *Id.*

[85] *See United States v. Miller*, 430 F.3d 93 (2d Cir. 2005) (holding that a law-enforcement officer lawfully present in an area may conduct a protective sweep even if he is in a particular area for a purpose other than the execution of an arrest); *United States v. Gould*, 364 F.3d 578 (5th Cir. 2004) (*abrogated on other grounds by King*, 563 U.S. 452) ("[W]e hold that arrest is not always, or per se, an indispensable element of an in-home protective sweep, and that although arrest may be highly relevant, particularly as tending to show the requisite potential of danger to the officers, that danger may also be established by other circumstances."); *Leaf v. Shelnutt*, 400 F.3d 1070 (7th Cir. 2005) ("[I]t was not necessary for the officers to have made an arrest in order for their search of the apartment to be justified; the only question is whether the search was objectively reasonable.").

[86] At least one Ninth Circuit panel has assumed without deciding that an arrest is not required. *See Franco*, 744 Fed. Appx. at 363 ("For purposes of this disposition, we assume that a protective sweep can be conducted absent arrest.").

14

not rely on the protective-sweep exception to the warrant requirement here.  I therefore find that the officers are entitled to qualified immunity from this claim because Looper cannot demonstrate that it was clearly established that she had a right to be free from a warrantless protective sweep at the time of the challenged conduct.  I thus grant summary judgment in the officers' favor on Looper's unreasonable-search claim.

**B.    The defendants are entitled to qualified immunity from Looper's unreasonable-seizure claim because the circumstances of Raider's attack didn't fit into any clearly established law.**

Looper's first cause of action also contains a Fourth Amendment unconstitutional-seizure claim.  She theorizes that by permitting her "to be mauled, traumatized, and seriously injured by Raider inside of her rental," the officers deprived her "of her right to be free from unreasonable . . . seizures" because Raider was intentionally deployed to bite a subject—and he did.[87]  The officers argue that they are entitled to qualified immunity from this claim because they "did not intentionally deploy Raider to enter the premises or to bite" Looper, so no seizure occurred; regardless, "[t]here is no clearly established law [that] an accidental police K-9 bite can constitute an[] unreasonable search and seizure."[88]

Even if Raider's attack constitutes a Fourth Amendment seizure,[89] Looper has not shown that the contours of her right to be free from such a seizure were "sufficiently clear that every

---

[87] ECF No. 7 at 9, ¶ 36; ECF No. 29 at 8–16.

[88] ECF No. 23 at 11, 14–15.

[89] Because I address the clearly established prong of the qualified-immunity analysis first for this seizure claim and find it dispositive, I don't decide whether an unlawful seizure occurred here. *See Ashcroft*, 563 U.S. at 735 (quoting *Pearson v. Callahan*, 555 U.S. 223, 236–27 (2009)) (reiterating that "lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first" and cautioning that "[c]ourts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case'").

reasonable official would have understood that what" the officers were doing here "violate[d] that right."[90]  Looper offers two types of cases in her effort to do so.  She first relies on the United States Supreme Court's opinion in *Brower v. Inyo*[91] for the overarching Fourth Amendment principles that (1) "all that is required [for an act to be a seizure] is an intentional deployment of an instrumentality that achieves the intended result" and (2) "a seizure takes place even when an unintended person becomes detained."[92]  She then offers the more specific K-9 cases that apply these general principles to hold that a seizure occurs when an officer deploys the instrumentality of an attack dog and his attack was the intended result, even if it targeted an unintended person.[93]

### 1.    *Broad Fourth Amendment principles don't clearly establish that the officers' conduct here was unconstitutional.*

The Supreme Court has cautioned that lower courts must avoid addressing qualified immunity at a high level of generality,[94] and the facts of *Brower* are too dissimilar to clearly establish the rules for this K-9 scenario.  Brower was killed when the stolen car that he was driving at high speed to elude police crashed into a roadblock.[95]  His representatives claimed that the police officers "used 'brutal, excessive, unreasonable[,] and unnecessary physical force'" in establishing the roadblock and "effected an unreasonable seizure of Brower, in violation of the

---

[90] *Ashcroft*, 563 U.S. at 741.

[91] *Brower v. Cnty. of Inyo*, 489 U.S. 593 (1989).

[92] ECF No. 29 at 8.

[93] *Id.* at 8–16, 21–22.

[94] *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (citing *al-Kidd*, 563 U.S. at 742).

[95] *Brower*, 489 U.S. at 594.

Fourth Amendment."[96]  The High Court determined that a seizure occurred because police acted with intent both in pursuing a suspect and in deploying the roadblock that ultimately stopped him: "Brower was meant to be stopped by the physical obstacle of the roadblock—and that he was so stopped."[97]  *Brower* provides no guidance on police-dog handling, so it falls far short of clearly establishing that the officers' conduct here constituted an unconstitutional seizure of Looper.

> ### 2.    *No case addressing on-leash K-9 handling in a situation like this one clearly established that the officers' conduct effected an unlawful seizure.*

The more specific K-9 attack cases that Looper cites to are too factually distinguishable to show that a reasonable officer in the instant scenario would have understood that what he was doing violated Looper's rights.  Looper cites *Rogers v. City of Kennewick*, an unpublished Ninth Circuit opinion,[98] to argue that it was clearly established that it is not necessary that officers intend to restrain someone for a dog bite of that person to be considered a seizure.[99]  In *Rogers*, police were searching for a suspect who was wanted for traffic infractions.[100]  K-9 officer Deke, who was trained to bite and hold when he identified a suspect, was deployed to track and

---

[96] *Id.*

[97] *Id.* at 599.

[98] Unpublished decisions likely don't clearly establish rights for qualified-immunity purposes. *See DeFrancesco v. Robbins*, 136 F.4th 933, 939 (9th Cir., May 7, 2025) (quoting *Sorrels v. McKee*, 290 F.3d 965, 971 (9th Cir. 2002)) (noting that "though we 'have held that unpublished decisions may inform our qualified immunity analysis,' rarely have we concluded, 'absent any published opinions on point or overwhelming obviousness of illegality,' that 'the law was clearly established on the basis of unpublished decisions only.'").

[99] *Id.* at 10; *Rogers v. City of Kennewick*, 206 F. App'x 657, 658 (9th Cir. 2006) (unpublished).

[100] *Rogers*, 206 F. App'x at 659.

apprehend a suspect.[101]  When Deke alerted outside of a residence, his handler unleashed him, apparently without any verbal warning.[102]  Deke entered the backyard and found and bit Rogers, an innocent bystander.[103]  The district court, and the Ninth Circuit on appeal, held that the attack was an unconstitutional seizure and, among other things, that it was "clearly established at the time of the incident" that "failing to give a warning before releasing a police dog to bite and hold is unreasonable."[104]

A second leash-release case Looper relies on is *Vathekan v. Prince George's County*, in which a police dog sent into a home unleashed mauled an innocent occupant.[105]  Police had been called to the home by the occupant of the basement apartment who discovered a broken window and suspected that the home had been burglarized.[106]  When the K-9 unit was called to the scene, the handler was told that nobody was in the house, so he opened the door and "released the dog into the house" with the command of "Find him!" and no verbal warning.[107]  Instead of a burglar, the dog found the home's occupant, Vathekan, who got brutally mauled.  The Fourth Circuit found that it was "clearly established" at the time "that it is objectively unreasonable for a police officer to fail to give a verbal warning before releasing a police dog to seize someone."[108]

---

[101] *Rogers v. City of Kennewick*, 2005 WL 8158740, at **2, 6 (E.D. Wash. 2005), *aff'd*, 206 F. App'x 657 (9th Cir. 2006), and *aff'd*, 205 F. App'x 491 (9th Cir. 2006).

[102] *Id.*

[103] *Id.*

[104] *Rogers*, 206 F. App'x at 659.

[105] *Vathekan v. Prince George's Cnty.*, 154 F.3d 173 (4th Cir. 1998).

[106] *Vathekan*, 154 F.3d at 176.

[107] *Id.* at 178.

[108] *Id.* at 179.

But the principles of *Rogers* and *Vathekan* don't squarely govern Looper's attack. As the Fourth Circuit elucidated in *Melgar ex rel. Melgar v. Greene*,[109] the unleashed-dog–unintended-target cases like *Vathekan* "cannot fairly be understood as providing near-strict liability on officers any time they use police dogs. Rather, they must be understood in the context of the right actually addressed, which was 'that failure to give a warning *before releasing* a police dog is objectively unreasonable in an excessive-force context.'"[110] As the *Melgar* court reasoned, "[t]here is a vast difference between an officer releasing a dog off a leash knowing with a good degree of certainty that it will find and bite its target and an officer exercising substantial control over a leashed animal with the expectation of being able to prevent any injury. Cases addressing the former simply do not provide sufficient guidance to officers in the latter situation."[111]

Persuaded by the *Melgar* court's distinction, I find that the facts of *Rogers* and *Vathekan* and any other off-the-leash cases are too distinguishable from the instant facts to have put these officers on notice that their conduct was unlawful. Raider was on "a standard leash" with a harness and "pinch collar" when he attacked Looper.[112] While Officer Obsenares admits that he "had the leash too far extended,"[113] Raider was not unleashed.[114] So the cases establishing that an officer must give a verbal command before releasing an unleashed canine to find and bite a

---

[109] *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348 (4th Cir. 2010).

[110] *Id*. (emphasis original).

[111] *Id*.

[112] *See* Obsenares depo., ECF No. 29-3 at 90:6–8; 91–92; 106.

[113] *Id*. at 94:11–13; 111–112 ("I literally thought that the conversation was farther away. The leash control should have been utilized better approaching the doorway the second time. Like he said before, when I approached the doorway the first time it was closed, and seconds later it was opened. So that was my fault.").

[114] *Id*. at 110, 116.

suspect did not clearly establish that the officers' conduct here would violate the Fourth

Amendment.

While Looper argues that it's enough that the officers intentionally deployed Raider to

find and bite someone, which he did,[115] the Ninth Circuit in the unpublished case of *Gangstee v.*

*County of Sacramento* rejected such a premise.  In *Gangstee*, an unleashed K-9 was brought out

of his vehicle and commanded to merely "watch" a car-chase suspect who was still in his

vehicle.[116]  The dog instead took off and bit an innocent bystander.[117]  Though the district court

granted summary judgment for the defendants because there was no evidence that the officer

"intentionally deployed" the dog "to effect a seizure," it suggested when recounting the

controlling authority that "upon intentional deployment of a canine, the canine's handler is

constitutionally responsible for *any* unreasonable seizure the canine makes."[118]  So the Ninth

Circuit panel affirmed the district court's ruling but rejected its blanket rule statement:

> We do not agree with the district court's reasoning.  A violation of
> the Fourth Amendment on the basis of an unreasonable seizure
> 'requires an intentional acquisition of physical control.'  The
> victim must be the 'object of the detention."  Here, there is no
> evidence, nor contention that [the handler] intentionally deployed
> his canine in an effort to seize Gangstee.  We are therefore bound
> by *Brower*, and affirm on that basis.

Both sides offer up district-court decisions with disparate holdings.  Looper points to

*McKay v. City of Hayward*, in which police "responding to a 'high priority' armed robbery" from

which the suspect fled on foot lowered a K-9 on a 33-foot leash over an 8-foot wall into a

---

[115] ECF No. 29 at 8–11.

[116] *Gangstee v. County of Sacramento*, 2012 WL 112650, *2 (E.D. Cal. Jan. 12, 2012).

[117] *Id.* at *2–3.

[118] *Gangstee*, 567 Fed. App'x. 500 at 501 (9th Cir. 2014) (unpublished) (emphasis original).

backyard.[119]  The home's occupant was in that backyard, the dog attacked him, and he later died from his injuries.[120]  "A seizure did occur," the court concluded.[121]  "That Mr. Porter was not the robber or the target of the search does not matter.  What creates the seizure is the government's . . . intentional deployment of a police dog trained to track and bite a person."[122]  So Looper cites *McKay* as an example of cases holding "that the seizure was intentional because the officer had intended to deploy the canine, with knowledge that the canine would bite whoever it found."[123]  But even the *McKay* court ultimately granted summary judgment in favor of the officers because it was not "clearly established that, under the circumstances, the use of the police dog was unlawful."[124]

The defendants counter primarily with *Edmiston v. City of Port Angeles*, in which a K-9 unit was pursuing a fleeing car thief and climbed onto the deck of a home.  When Mr. Edmiston, who was the home's occupant but not the car thief, stepped out onto the deck, the dog got away from his handler and bit Edmiston in the leg.[125]  Like Looper here, "Edmiston assert[ed] that an accidental dog bite committed by a police canine violated his right to be free of unlawful search and seizure under the Fourth Amendment."[126]  And Edmiston similarly argued that a seizure occurred under *Brower* because the officer "intended to deploy" the dog.[127]  But the court found

---

[119] *McKay v. City of Hayward*, 949 F. Supp. 2d 971, 980–81 (N.D. Cal. 2013).

[120] *Id*. at 975–76.

[121] *Id*. at 979.

[122] *Id*.

[123] ECF No. 2 at 13.

[124] *McKay*, 949 F. Supp. 2d at 983.

[125] *Edmiston v. City of Port Angeles*, 360 F. Supp. 3d 1147, 1151 (W.D. Wash. 2018).

[126] *Id*. at 1152.

[127] *Id*.

1    that Edmiston's intentional-deployment argument "ignore[d] the *Brower* court's key distinction

2    between intentional actions and accidental mistakes—i.e., that the police in *Brower* acted with

3    intent, both in pursuing Brower as a suspect, and in deploying the roadblock means that

4    ultimately stopped him."[128]  "A conclusion that Edmiston establishes a seizure simply because

5    [the officers] intended to use [the dog] at all would eliminate any meaningful distinction between

6    intentional and unintentional government action, which is clearly contrary to the authority in this

7    area of law," it reasoned.[129]  So the *Edmiston* court held that no seizure had occurred under

8    *Brower*.[130]

9           These conflicting decisions,[131] coupled with the absence of a published Ninth Circuit

10   case addressing the proper handling of a leashed K-9 officer in even remotely similar

11   circumstances, demonstrate that it was not clearly established that the officers' conduct here was

12   a seizure, let alone an unconstitutional one.  So I find that the officers enjoy qualified immunity

13   from Looper's unlawful-search claim, and I grant summary judgment on that basis.

14

15

16

17

18

---

19   [128] *Id*. at 1153.

20   [129] *Id*.

21   [130] *Id*. at 1158.

22   [131] "The Supreme Court [also] has not clarified when state and district court decisions could place a 'statutory or constitutional question beyond debate.'" *al-Kidd*, 563 U.S. at 741. "[D]istrict court decisions—unlike those from the court of appeals—do not necessarily settle constitutional standards" because "[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011).

### C. The officers also are entitled to summary judgment on Looper's excessive-force claim based on qualified immunity.

In her second cause of action, Looper alleges that Raider's attack also constituted excessive force that violated her Fourth Amendment rights.[132]  For the same reasons that the defendants are shielded from the unlawful-seizure claim, they are entitled to summary judgment on this one.  "Excessive-force claims are founded on the Fourth Amendment right to be free from unreasonable seizures of the person."[133]  They "require (1) a seizure and (2) excessive force."[134]  Because Looper has not shown that it was clearly established that Raider's attack in these circumstances constituted a seizure under the Fourth Amendment, the officers are entitled to qualified immunity on this claim, too.

## II. Metro is entitled to summary judgment on Looper's *Monell* claim because she has not established that Metro's action or inaction amounts to deliberate indifference or was the moving force behind her injury.

Looper seeks to hold Metro liable for its officers' federal constitutional violations under the municipal-liability theory adopted in *Monell v. Department of Social Services*.[135]  She contends that Metro's *Monell* liability derives from its failure "to properly train Officer Obsenares to announce the presence of a canine before deploying Raider."[136] According to Looper, the fact that "canine handlers are trained to give warnings and announcements before they let a canine off leash" means that Metro "clearly understands that when a canine is released

---

[132] ECF No. 7 at 9–10.

[133] *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017) (citing U.S. Const. amend. IV; *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)) (cleaned up).

[134] *Cuevas v. City of Tulare*, 107 F.4th 894, 898 (9th Cir. 2024) (citing *Scott v. Harris*, 550 U.S. 372, 381 (2007)).

[135] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

[136] ECF No. 29 at 24.

off leash, it is going to bite/detain someone, including potentially innocent bystanders" and that it "also understands that innocent people can and are likely to be bitten if they are within the area of the canine when it is released."[137]  The "issue," says Looper, is that "[t]his is true even when the canine is on a leash" and that, despite having knowledge that police dogs may bite innocent bystanders even when on a leash, Metro "does not train its canine handlers to give announcements/warnings when they are deploying canines on leash into populated areas" or "tight quarters . . . where [ ] the canine could easily come into contact with the suspect or a non-suspect."[138]  Looper argues that this lack of training is "particularly alarming" given that Metro's K-9 handbook instructs officers to "attempt to make contact with home owners . . . to avoid an accidental bite" and make "every effort" to verify that animals and uninvolved parties are absent before entering a home.[139]

### A.    Failure-to-train liability requires a showing of deliberate indifference that was the moving force behind the constitutional injury.

Liability can attach under *Monell* when "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."[140]  "[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality"; the plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."[141]  "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious

---

[137] *Id.*

[138] *Id.* at 25.

[139] *Id.*

[140] *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

[141] *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

24

consequence of his action."[142]  A plaintiff can establish deliberate indifference by demonstrating that either "[a] pattern of similar constitutional violations by untrained employees" exists or "the unconstitutional consequences of failing to train" are "so patently obvious that a city could be liable . . . without proof of a pre-existing pattern of violations."[143]  This latter showing, known as "single-incident liability," is "rare" and occurs only "in a narrow range of circumstances."[144]

### B.    Looper hasn't shown that deliberate indifference was the moving force behind her injury.

Looper contends that Metro's handbook policies illustrate that the department is aware that "'on leash' deployment of a canine creates the same potential for constitutional harm as deployment of an 'off leash' canine" but fails to properly train officers to announce the presence of a canine anyway.[145]  But as Metro points out, Looper "makes no attempt to identify any other instance where a Metro police K[-]9 allegedly bit a suspect without a warning."[146]  She argues that Metro should "train its canine handlers to give announcements/warnings when they are deploying canines on leash into populated areas," and points to a statement from Metro Sergeant Harris that a majority of accidental bites occur when canines are on their leashes.[147]  Looper also does not provide any case suggesting that not announcing the presence of a leashed canine would amount to a constitutional violation.[148]  And anecdotal reports like Harris's statement fall short

---

[142] *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quotation omitted).

[143] *Id.* at 62–64 (quotation omitted).

[144] *Id.*

[145] *Id.* at 26.

[146] ECF No. 32 at 15–16.

[147] ECF No. 29 at 25.

[148] *See id.*

of what is necessary to defeat summary judgment on this *Monell* claim.  Looper also offers no evidence to support a finding that this case is one of the rare circumstances in which the plaintiff need not establish a pattern of violations.  Because Looper has not produced evidence showing that Metro can be held liable under *Monell*, I grant the defendants' motion for summary judgment on this claim.

## III.   The court declines to exercise supplemental jurisdiction over Looper's remaining state-law claims.

The resolution of Looper's federal civil-rights claims leaves only her state-law claims for battery, negligence, and violations of Nevada's constitution.  Because this lawsuit was filed in federal court based on federal-question jurisdiction, this court is exercising supplemental jurisdiction over these state-law claims.  Federal courts are courts of limited jurisdiction, and they maintain supplemental jurisdiction over state-law claims that "are so related to claims in the action" that they form the same case or controversy with the claims over which the court has jurisdiction.[149]  But once a plaintiff's federal claims are gone, the court may decline to exercise supplemental jurisdiction over the remaining state-law claims.[150]  Because I grant summary judgment in favor of the defendants on Looper's federal claims, I decline to continue to exercise supplemental jurisdiction over Looper's state-law claims.  So I dismiss them without prejudice to her ability to refile them in state court under 28 U.S.C. § 1367.

---

[149] 28 U.S.C. § 1367(a).

[150] 28 U.S.C. § 1367(c)(4); *see Harrell v. 20th Century Ins. Co.*, 934 F.2d 203, 205 (9th Cir. 1991) ("[I]t is generally preferable for a district court to remand remaining pendent claims to state court.").

**Conclusion**

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment **[ECF No. 23] is GRANTED in part**. Judgment is entered in favor of defendants Glenn Obsenares and Brayden McMahill on the federal Fourth Amendment-based portions of Plaintiff Jacey Looper's first and second claims for relief (unreasonable search and seizure and excessive force) and also in favor of the Las Vegas Metropolitan Police Department on Looper's third claim for relief (*Monell* liability).

Because the disposition of these federal claims leaves no remaining claims over which this court has original jurisdiction, this court declines to exercise supplemental jurisdiction over Looper's remaining claims for battery, negligence, and violations of Nevada's constitution. IT IS THEREFORE ORDERED that **all remaining claims are DISMISSED without prejudice to their refiling in state court under 28 U.S.C. § 1367(c).** And with good cause appearing and no reason to delay, the Clerk of Court is directed to **ENTER FINAL JUDGMENT** accordingly and **CLOSE THIS CASE.**

_____
U.S. District Judge Jennifer A. Dorsey
September 2, 2025